**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| DISH NETWORK L.L.C., § | |
| § | |
| *Plaintiff*, § | |
| § | |
| v. § | CIVIL ACTION H-19-4563 |
| § | |
| NAUMAN KHALID, D/B/A FREETVALL.COM, § | |
| FREETVALL.NET, FREETVALL.XYZ, § | |
| FREETVALL.ME, FREETVALL.LIVE, § | |
| LIVETVCAFE.COM, LIVETVCAFE.NET, § | |
| LIVETVCAFE.ME, TIME4TV.COM, § | |
| TIME4TV.NET, TIME4TV.ME, CRICKET- § | |
| TV.NET, CRICKET-TV.ME, TV4EMBED.COM, § | |
| AND A1LIVETV.COM, § | |
| § | |
| *Defendant*. § | |

**MEMORANDUM OPINION AND ORDER**

Pending before the court is plaintiff DISH Network L.L.C.'s ("DISH") combined motion for entry of default and default judgment (Dkt. 15). Contained therein is also an application for a permanent injunction. Defendant Nauman Khalid has not responded or otherwise participated in this suit. After reviewing the motion and applicable law, the court is of the opinion that DISH's motion should be GRANTED.

**I. BACKGROUND**

This is a copyright infringement suit that revolves around a series of websites that provided access to streams of international television channels.

DISH provides pay-television services to subscribers in the United States. Dkt. 8 ¶ 10. Some of its offerings include international channels, for which DISH contracts and licenses rights from the channel owners. *Id.* ¶ 11.

These channel owners are referred to in this order as the "Networks," and include Al Jazeera Media Network; ARY Digital USA LLC; B4U U.S., Inc.; Bennet, Coleman and Company Limited; Century Media Network Inc.; Television Media Network (Pvt) Ltd; GEO USA LLC; Globosat Entertainment, LLC; Hum Network Limited; MBC FZ LLC; MSM Asia Limited; National Communications Services (SMC-PVT.) Limited; Soundview Broadcasting LLC; and TV Today Network Ltd. *Id.*

The Networks' channels, which the court refers to as the "Protected Channels," include Aaj Tak; Al Jazeera Arabic News; ARY Digital; ARY News; ATN News; B4U Movies; B4U Music; Dunya TV; Express Entertainment; Express News; Geo News; Geo TV; Hum Sitaray; Hum Masala; Hum TV; Hum World; India Today; MBC1; MBC Drama; MBC Kids (a/k/a MBC3); MBC Masr; NTV Bangla; Sahara Samay; SAB; SET Max; Sony Mix; Sony SET; Times Now; and Zoom. *Id.* ¶ 12.

DISH acquired, through written licensing agreements, the exclusive right to distribute and publicly perform in the United States the Protected Channels and the works shown on those channels. *Id.* ¶ 13. While many of these works are registered with the United States Copyright Office, many are not. *Id.* At no time did DISH authorize Khalid to exercise any of its exclusive rights. *Id.* ¶ 14.

Khalid owned and operated a collection of websites the court will refer to as the "Free TV Websites." *Id.* ¶ 15. These websites include Freetvall.com, Freetvall.net, Freetvall.xyz, Freetvall.me, Freetvall.live, Livetvcafe.com, Livetvcafe.net, Livetvcafe.me, Time4tv.com, Time4tv.net, Time4tv.me, Cricket-tv.net, Cricket-tv.me, Tv4embed.com, and A1livetv.com. *Id.* at 1. On the Free TV Websites, Khalid provided United States users with links to unauthorized streams of the Protected Channels. *Id.* ¶ 15. He collected the links and then uploaded them,

organized them by name and language, and even offered a search function for users to more easily find them. *Id.* ¶ 16–17. Khalid monetized the Free TV Websites by selling advertisements. *Id.* ¶ 20.

DISH notified Khalid at least 49 times over several years that he was infringing its exclusive rights by providing links in this manner to his U.S. audience. *Id.* ¶ 21. Additionally, DISH sent the same number of notices to the service providers who made it possible for Khalid to operate the Free TV Websites. *Id.* ¶ 22. When some of these service providers complied with the notices and removed infringing content, Khalid "intentionally interfered with the takedown efforts" by switching to different providers or using new links. *Id.*

On these facts, DISH alleged that Khalid had induced and materially contributed to copyright infringement under § 501 of the Copyright Act (also referred to as the "Act"). 17 U.S.C. § 501. Although he was served and an executed summons was returned, Khalid has not otherwise participated in this suit. On July 3, 2020, DISH moved for default judgment. Dkt. 15. DISH is seeking statutory damages and a permanent injunction. Dkt. 15-6.

## II. Legal Standard

Under Federal Rule of Civil Procedure 55(a), "[w]hen a party against whom judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). Under Rule 55(b)(2), a party may apply for the court to enter a default judgment, and the "court may conduct hearings or make referrals—preserving any federal statutory right to a jury trial—when, to enter or effectuate judgment, it needs to: (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter." Fed. R. Civ. P. 55(b)(2).

A default judgment is a "drastic remedy, not favored by the Federal Rules[,] and resorted to by courts only in extreme situations." *Sun Bank of Ocala v. Pelican Homestead & Sav. Ass'n*, 874 F.2d 274, 276 (5th Cir. 1989). "The Federal Rules of Civil Procedure are designed for the just, speedy, and inexpensive disposition of cases on their merits, not for the termination of litigation by procedural maneuver." *Id.* A default judgment, thus, "must be 'supported by well-pleaded allegations' and must have 'a sufficient basis in the pleadings.'" *Wooten v. McDonald Transit Assoc., Inc.*, 788 F.3d 490, 498 (5th Cir. 2015) (quoting *Nishimatsu Constr. Co. v. Hou. Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)). The well-pleaded allegations in the complaint are assumed to be true. *Nishimatsu*, 515 F.2d at 1206.

A court may not enter a default judgment against a minor or incompetent person unless the person is represented by a general guardian, conservator, or other like fiduciary who has appeared. Fed. R. Civ. P. 55(b). Additionally, a court may not enter a default judgment if the plaintiff does not file an affidavit regarding the defendant's military status. 50 U.S.C. § 3931(b)(1). If the defendant is in the military service, "the court may not enter a judgment until after the court appoints an attorney to represent the defendant." *Id.* § 3931(b)(2). Local Rule 5.5 requires that motions for default judgment "be served on the defendant-respondent by certified mail (return receipt requested)." S.D. Tex. L.R. 5.5.

### III. ANALYSIS

*A. Entry of Default*

It is evident from the docket that Khalid has not "plead[ed] or otherwise defend[ed]" himself in this case. *See* Fed. R. Civ. P. 55(a). It is also clear that Khalid was served in Pakistan. Dkt. 12. In fact, DISH submitted to the court a return of service of summons from Pakistan that

4

had been executed by Khalid. *Id.* Because international service is not as common as domestic service, the court finds it prudent to establish that service was proper in this case.

Federal Rule of Civil Procedure 4(f) governs the service of defendants who live in foreign countries. Fed. R. Civ. P. 4(f). The rule permits service "by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents [("Hague Convention")] . . . ." Fed. R. Civ. P. 4(f)(1). As DISH claims, Pakistan is indeed bound by the Hague Convention. Dkt. 15 at 1; *Status Table*, Hague Conference on Private International Law, https://www.hcch.net/en/instruments/conventions/status-table/print/?cid=17 (last updated Jan. 19, 2021). Article 10(c) of the Hague Convention provides that, unless the destination state objects, "the present Convention shall not interfere with the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination." Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters art. 10(c), Nov. 15, 1965, 20 U.S.T. 361 [hereinafter Hague Convention].[1] Importantly, Pakistan has not objected to Article 10(c). *See Pakistan – Central Authority & Practical Information*, Hague Conference on Private International Law, https://www.hcch.net/en/states/authorities/details3/?aid=288 (last updated Sept. 25, 2006). Here, DISH served Khalid through Pakistani advocate Riasat Ali of Faisalabad, Khalid executed the acknowledgment, and it was returned to DISH. Dkt. 12. The court finds that service was proper in accordance with Rule 4(f) and the Hague Convention. Therefore, DISH is entitled to an entry of default.

---

[1] The court's review of Article 10 sections (b) and (c) leads it to believe that (b) is probably the most relevant provision, but (c) seems to be applicable as well, even if broader in scope. *Compare* Hague Convention, *supra*, art. 10(b) (pertaining to "judicial officers, officials or other competent persons"), *with id.* art. 10(c) (pertaining to "any person interested in a judicial proceeding").

### B. Procedural Requirements

The court finds that DISH has satisfied all other procedural requirements for obtaining a default judgment. *See* Fed. R. Civ. P. 55(b) (requirements related to competence); 50 U.S.C. § 3931 (military status). It now turns to the substance of DISH's claims.

### C. Contributory Copyright Infringement

There are essentially four elements that a plaintiff must prove to succeed on a claim for contributory copyright infringement: (1) "ownership of the copyrighted material"; (2) direct infringement by another; and that the defendant (3) "with knowledge of the infringing activity"; (4) "induce[d], cause[d] or materially contribute[d]" to it. *See Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 790 (5th Cir. 1999) (citations omitted); *see also Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930, 125 S. Ct. 2764 (2005).

#### 1. Copyright Ownership

Through written licensing agreements with the copyright owners (the Networks), DISH has acquired the exclusive right to distribute and publicly perform the works that air on the Protected Channels. *See* 15-1 at 6. This transfer complies with the requirements of the Copyright Act. *See* 17 U.S.C. §§ 201(d), 204(a). It is also sufficient to give DISH the right to bring its claims under the Act. *Id.* § 501(b). Thus, if the works at issue are protected under the Copyright Act, DISH has demonstrated that it validly owns at least two of the attendant rights: the right to distribute and the right to publicly perform. *See id.* § 106(3)–(4).

Next, the court must decide whether the works at issue enjoy protection under the Copyright Act. There are two sets of published works protected by the Act. One set comprises works first published in the United States, known under the Act as "United States work[s]."[2] *See*

---

[2] The provision defining "United States work" is a little more complicated than explained here, but that complexity is not relevant to this analysis. *See id.* § 101 (definition of "United States work").

6

*id.* § 101. The other set contains all other works. United States works are only protected if registered with the United States Copyright Office. *Id.* § 411(a). But registration is not irrelevant for the other works. In fact, for non-United States works, registration creates a presumption of ownership and validity. *See id.* § 410(c); *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004) ("A certificate of registration, if timely obtained, is prima facie evidence of both that a copyright is valid and that the registrant owns the copyright."). Unregistered non-United States works are protected if, when first published, at least one of the authors is a "national, domiciliary, or sovereign authority of a treaty party"; or the work is first published in a foreign nation that is a treaty party on the day of publication.[3] 17 U.S.C. § 104(b).

All of the works at issue in this suit are non-United States works because they were "authored or first published in the United Arab Emirates, Qatar, Pakistan, India, [or] Bangladesh." Dkt. 15-1 at 7. These countries are treaty parties because they are all signatories to the Berne Convention for the Protection of Literary and Artistic Works ("Berne Convention"). *Id.* at 7–8 (citing U.S. Copyright Off., Circular 38A, International Copyright Relations of the United States, https://www.copyright.gov/circs/circ38a.pdf (last updated Feb. 2021)); *see also* 17 U.S.C. § 101 (defining "treaty party" to specifically include signatories to the Berne Convention). Therefore, the works at issue are all protected under the Copyright Act. Nevertheless, 112 of the works also enjoy a presumption of ownership and validity because they are registered with the United States Copyright Office. *Id.* at 8.

    2.   *Direct Infringement*

DISH alleges in its First Amended Complaint that Khalid "searched the Internet for unauthorized sources of the Protected Channels and identified links to that content." Dkt. 8 ¶ 17.

---

[3] The court has again simplified this provision.

The direct infringement alleged, then, is the retransmission by unnamed third parties of the Protected Channels. This is indeed an infringement of DISH's right to publicly perform the works retransmitted by these third parties without authorization. *See Am. Broad. Cos. v. Aereo, Inc.*, 573 U.S. 431, 435–36, 134 S. Ct. 2498 (2014).

In *American Broadcasting Companies, Inc. v. Aereo, Inc.*, the U.S. Supreme Court made the following observation regarding a copyright owner's right of public performance:

> The Act's Transmit Clause defines [the right to perform] to include the right to "transmit or otherwise communicate a performance . . . of the [copyrighted] work . . . to the public, by means of any device or process, whether the members of the public capable of receiving the performance . . . receive it in the same place or in separate places and at the same time or at different times."

*Id.* (citing 17 U.S.C. § 101). The Supreme Court found infringement in that case where Aereo had transmitted broadcast television programming, much of which consisted of copyrighted works, over the internet to its subscribers. *Id.* at 2503. This is precisely the type of direct infringement that is alleged in this case: one or more unnamed third parties are alleged to have transmitted the works from the Protected Channels over the internet to viewers. Therefore, the court finds that this element has been satisfied by the well-pleaded facts in DISH's First Amended Complaint.

      3.   *Knowledge*

The next question is whether Khalid knew of the direct infringement discussed in the previous section. This element is easily satisfied because, beginning in 2013, DISH sent almost fifty notices of infringement to email addresses associated with the Free TV Websites. Dkt. 8 ¶ 21; Dkt. 15-1 at 10. These notices were also sent to service providers relied upon by the websites. Dkt. 8 ¶ 22. The service providers are believed to have forwarded at least some of these notices to the email addresses they had on file. *Id.* When the service providers removed the unauthorized content, Khalid is alleged to have "intentionally interfered with the takedown efforts." *Id.* These facts, taken as true, are sufficient to establish that Khalid had knowledge that the streams he linked

8

to, which contained unauthorized transmittals of DISH's protected works, constituted direct copyright infringement.

### 4. *Inducement & Material Contribution*

The core of DISH's contributory copyright infringement claim against Khalid is that he "served as the intermediary between third parties who directly infringed DISH's exclusive distribution and public performance rights and Free TV Website users, who become a necessary component of the infringement – the audience." Dkt. 15-1 at 10. Khalid's role as an intermediary constituted inducement of and material contribution to the unnamed third-parties' direct infringement. Specifically, Khalid is alleged to have: (1) "selected the channels that were made accessible" to the website users; (2) "acquired, uploaded, maintained, and controlled the links" found on the website; (3) "organized and presented the Protected Channels" to enable easy access; and (4) "created the audience" to complete the third-party's direct infringement. Dkt. 8 ¶¶ 27–29. The court finds that these allegations amount to inducement and material contribution.

Because the well-pleaded facts alleged by DISH show copyright ownership, direct infringement, knowledge, and inducement/material contribution, the court finds that Khalid is liable for contributory copyright infringement.

### D. Damages

In the case of infringement, the Copyright Act allows the copyright owner to choose either (1) actual damages and additional profits or (2) statutory damages. 17 U.S.C. § 504(a), (c). If the owner elects to recover statutory damages, generally he or she may only obtain a maximum of $30,000 per work. *Id.* § 504(c)(1). If, however, the court finds that the infringement was committed willfully, it is within the court's discretion to increase the damages award to a maximum of $150,000 per work. *Id.* § 504(c)(2).

If a court determines that default judgment should be granted, the court has "wide latitude" to determine damages without first holding a hearing if the "amount claimed is a liquidated sum or one capable of mathematical calculation." *James v. Frame*, 6 F.3d 307, 310 (5th Cir. 1993). Here, DISH elects to pursue statutory damages but only for the 112 works registered with the United States Copyright Office.[4]  Dkt. 15-1 at 10–11.  Because DISH elects to recover statutory damages, the court does not need to hold a hearing as the total amount is capable of mathematical calculation.

The court now turns to the central question, then, which is whether Khalid's infringement was willful.  An infringement is willful if the defendant "knows his actions constitute an infringement." *Broad. Music, Inc. v. Xanthas, Inc.*, 855 F.2d 233, 236 (5th Cir. 1998). "Actual knowledge is not required; constructive knowledge of infringement satisfies the willfulness standard." *Microsoft Corp. v. Software Wholesale Club, Inc.*, 129 F. Supp. 2d 995, 1002 (S.D. Tex. 2000) (Rosenthal, J.) (citing *Fitzgerald Publ'g Co., Inc. v. Baylor Publ'g Co., Inc.*, 807 F.2d 1110, 1115 (2d Cir. 1986)).  Moreover, "[w]illfulness may be inferred if notice of a valid copyright was given prior to infringement." *Malaco Inc. v. Cooper*, No. 300CV2648P, 2002 WL 1461927, at *4 (N.D. Tex. July 3, 2002) (citing *Chi-Boy Music v. Charlie Club, Inc.*, 930 F.2d 1224, 1227 (7th Cir. 1991)).

Here, DISH alleges that Khalid had actual knowledge of his infringement because "[b]etween September 2013 and November 2019, [he] was provided with at least 47 notices demanding that he cease providing access to the Protected Channels." Dkt. 15-1 at 13.  At least

---

[4] DISH only pursues statutory damages for the 112 registered works because the Copyright Act prohibits an award of statutory damages where infringement "commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work." 17 U.S.C. § 412; *see also* Dkt. 15-1 at 11.  Because the other works were never registered, they cannot avoid this bar.

10

one of DISH's exhibits is a response from Khalid to one of these notices, demonstrating that he was aware of them. Dkt. 15-3 at 125. DISH notes that the same number of notices were sent to service providers that Khalid relied on to run the Free TV Websites. Dkt. 15-1 at 13. "[W]hen the service providers removed the Protected Channels," DISH avers, Khalid "used different service providers or links." *Id.* DISH claims that Khalid "continued to provide access to the Protected Channels until after DISH filed its complaint." *Id.*

These notices, if given prior to the infringement, are enough to allow the court to infer willfulness. Because DISH alleges that Khalid continued to provide access to the Protected Channels until it filed its complaint, then at least some of the infringing activity occurred after Khalid received DISH's notices of infringement. The court finds that this constitutes willful infringement of DISH's exclusive rights under the Copyright Act.

Now that the court has determined that Khalid's infringement was willful, the range of DISH's possible statutory damages award extends from $750 per work to $150,000 per work. 17 U.S.C. § 504(c)(2). The court must now decide where in that range the appropriate award lies. DISH urges that $150,000 per work is appropriate, leading to a total of $16,800,000 for the 112 registered works infringed. Dkt. 15-1 at 12.

"To determine the range of the award for . . . copyright . . . infringement, courts have considered factors such as: 'the willfulness of the defendant's conduct, the deterrent effect of an award on both the defendant and others, the value of the copyright, whether the defendant has cooperated in providing necessary records to assess the value of the infringing material, and the losses sustained by the plaintiff.'" *Epic Tech, LLC v. Lara*, No. 4:15-CV-1220, 2017 WL 5903331, at *1 (S.D. Tex. Nov. 30, 2017) (Harmon, J.) (quoting *Future World Elecs., LLC v. Over Drive Mktg., LLC*, No. 3:12-CV-2124-B, 2013 WL 5925089, at *4 (N.D. Tex. Nov. 5, 2013)). The court

has already addressed willfulness above but expressly finds that it weighs in favor of an award at the upper end of the statutory range in this analysis.

DISH maintains that maximum statutory damages are warranted in light of the massive scale and persistence of Khalid's infringement. Dkt. 15-1 at 11. A maximum award, DISH asserts, is the only consequence likely to deter future infringement of its copyrights by Khalid and others. *Id.* at 16. DISH estimates that the duration of Khalid's infringement was between five and nine years, and that the "Protected Channels were viewed 5,519,517 times." *Id.* at 11. The infringement continued even after Khalid received a multitude of infringement notices and was cut off by some service providers. *Id.* The court agrees that the need for deterrence weighs heavily in favor of a high statutory damages award.

Another factor considered by courts is the copyright owner's loss of revenue. While admitting that it is "inherently difficult to calculate," DISH makes a compelling case that Khalid's infringement likely led to a significant loss of subscription revenue. *Id.* at 14–15. The court finds it possible to infer from the cost of a DISH subscription ($180/month), the number of views of the Protected Channels (5,519,517), the number of lost subscribers to DISH's Arabic, Hindi, Urdu, and Bangla programming packages (thousands), and the number of Free TV Website users in the United States (an average of 49,900 in the last three years) that Khalid's infringement led to substantial losses for DISH. *See id.* at 15. These figures are quite large and support a statutory damages award at the upper end of the prescribed range.

Next, courts often look to the infringer's profits. Again, while hard to calculate, Khalid likely made substantial profits from his infringing activity. He offered a product—the programming on the Protected Channels—that cost him nothing to produce. He then monetized his immense viewership by selling advertisements. *Id.* at 14. From this, the court can infer that

Khalid substantially profited from his infringement. This factor points in the same direction as all others.

Finally, DISH argues that Khalid "should not be rewarded for his failure to defend this case, which effectively preclude[ed] DISH from calculating actual damages and profits." *Id.* at 16. The court agrees and finds that this factor also weighs in favor of awarding a large amount of statutory damages for each of the infringed registered works.

Because of the sheer breadth and duration of the infringement, the failure of Khalid to participate in this proceeding, his willingness to defy almost 50 notices of infringement and to evade service providers' attempts to halt the infringement, and the likelihood that he profited from the infringement and caused substantial losses of revenue to DISH, the court finds that an award of maximum statutory damages—$150,000 per registered work—is appropriate. Therefore, the total amount of damages that Khalid must pay DISH for the infringement of the 112 registered works is $16,800,000.

### E. Permanent Injunction

In addition to damages, DISH also seeks a permanent injunction ordering (1) Khalid and his representatives to stop the infringement; (2) third-party service providers to cease providing services to Khalid that support his infringement; and (3) registries and registrars to disable and transfer to DISH the domains used by Khalid to support his infringement. *Id.* at 20–23; *see also* 15-6.

Section 502(a) of the Copyright Act permits a court to grant injunctive relief on terms it finds "reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). The Supreme Court has stated that:

> a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an

> irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S. Ct. 1837 (2006).

First, DISH has demonstrated that it has been irreparably injured. DISH claims that it has suffered an irreparable injury that consists of reputational harm and lost profits that are difficult or impossible to calculate. Dkt. 15-1 at 17. Because of the magnitude of the infringement and the number of viewers who used the Free TV Websites to view the Protected Channels without authorization, it is almost certainly the case that DISH either lost or was prevented from gaining subscribers. Because this number is difficult to calculate precisely, it constitutes an irreparable injury. *See Fla. Businessmen for Free Enter. v. City of Hollywood*, 648 F.2d 956, 958 n.2 (5th Cir. 1981). And while DISH is being compensated through statutory damages for this infringement, the infringement may continue despite a damages award.

DISH also claims that it has suffered irreparable harm to its business reputation and goodwill because the "streams available on [Khalid's] Free TV Websites are not subject to DISH's quality assurance and security protocols and are plagued by interruption or downtime and poor picture quality," leading viewers to incorrectly assume that the quality of DISH's authorized product is similarly poor. Dkt. 15-1 at 18. This is undoubtedly a harm that Khalid's infringement has subjected DISH to. And the court agrees with DISH that monetary damages alone are insufficient to remedy this harm. Moreover, DISH is unlikely to actually collect any monetary award granted here, and that fact further supports a grant of a permanent injunction. *See Aspen Tech., Inc. v. M3 Tech., Inc.*, 569 F. App'x 259, 273 & n.56 (5th Cir. 2014) (per curiam).

Next, the court must seek to understand the balance of the hardships between the plaintiff and defendant. DISH argues, correctly, that an injunction here would not burden Khalid because

14

it would merely require him to "forego illegal conduct," an interest that "is not entitled to any weight." Dkt. 15-1 at 19.  The court agrees—following the law is not a cognizable hardship in an injunction interest-balancing analysis.  *See Atl. Recording Corp. v. Anderson*, No. H-06-3578, 2008 WL 2316551, at *10 (S.D. Tex. Mar. 12, 2008) (Gilmore, J.).

Finally, DISH argues that an injunction would serve the public interest by "protecting the copyrighted works airing on the Protected Channels, maintaining the incentive for Networks to produce these works and for DISH to license them." Dkt. 15-1 at 20.  This is absolutely true.  It is in the public's interest that the law designed to protect and reward innovation and creativity be enforced, especially in the face of such a brazen violation as the one perpetrated by Khalid. *See Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 517–18, 114 S. Ct. 1023 (1994) ("[C]opyright law ultimately serves the purpose of enriching the general public through access to creative works.").

DISH has shown that it is entitled to injunctive relief based on Khalid's numerous copyright violations.  But what injunction will issue? An injunction must be narrowly tailored to remedy only a plaintiff's specific harms; it may not enjoin all possible breaches of the law.  *See* Fed. R. Civ. P. 65(d) (outlining an injunction's required contents and scope); *Scott v. Schedler*, 826 F.3d 207, 212–13 (5th Cir. 2016) (per curiam) ("An injunction should not contain broad generalities.").  DISH asks the court to (1) enjoin Khalid and his representatives from continuing the infringement; (2) enjoin third-party service providers from supporting Khalid's infringement; and (3) order registries and registrars to disable and transfer to DISH the internet domains supporting Khalid's infringement.  Dkt. 15-1 at 21–22.  The court is persuaded that DISH's proposed injunctions are narrowly tailored to remedy its specific harms and to prevent future infringement by Khalid.

## IV. CONCLUSION

DISH's combined motion for entry of default and default judgment (Dkt. 15) is GRANTED.  The court AWARDS DISH $16,800,000 in statutory damages, which incorporates the court's finding of willful infringement.  The court also GRANTS DISH's application for a permanent injunction, which is found within the same motion.

The court ENJOINS the following entities in the manner explained:

1.     Khalid and any of his agents, servants, employees, attorneys, or other persons, including any other owners or operators of the Free TV Websites, acting in active concert or participation with any of the foregoing that receives actual notice of the order, are permanently enjoined from:

- Transmitting, streaming, distributing, publicly performing, linking to, hosting, promoting, advertising, or displaying in the United States, through the Free TV Websites, or any other domain, website, device, application, service, or process, any of the Protected Channels or any of the programming that comprises any of the Protected Channels; and

- Inducing or contributing to any other person's or entity's conduct that is prohibited by the preceding paragraph.

2.     Non-parties are permanently enjoined from providing any form of electronic storage, computer server, website hosting, file hosting (including data center and colocation, primary and backup storage, back-end), domain hosting, domain name registration, privacy protection for domain registration, anonymization for domain registration, proxy, content delivery network services, content acceleration (including traffic routing, bandwidth, content delivery networks, web content optimization, website/data security), advertising (including search based

online advertising), and social media services used in connection with any of the activities enjoined under Paragraph 1.

3. VeriSign, Inc., doMEn d.o.o., XYZ.COM LLC, Dog Beach, LLC, and any other registry or registrar of the domain names Freetvall.com, Freetvall.net, Freetvall.xyz, Freetvall.me, Freetvall.live, Livetvcafe.com, Livetvcafe.net, Livetvcafe.me, Time4tv.com, Time4tv.net, Time4tv.me, Cricket-tv.net, Cricket-tv.me, Tv4embed.com, and A1livetv.com, within 48 hours of receiving this order, shall transfer the domain names to DISH, including changing the registrar of record to the registrar selected by DISH at DISH's reasonable expense so that DISH may fully control and use the domain names.

4. Registries and registrars shall disable all future domain names used by Khalid to provide access to the Protected Channels in the United States, by making the websites and any other content located at the domain names inaccessible to the public within 48 hours of receiving this order and a declaration from DISH or its agent stating that the domain names are being used in such manner. Such domain names shall remain disabled so that the websites and content located at the domain names are inaccessible to the public until further order of this Court, or until DISH provides written notice to the registry or registrar that the domain names shall be reenabled.

Signed at Houston, Texas on February 23, 2021.

_____
Gray H. Miller
Senior United States District Judge

17